# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LAKARI KAREEM BERRY,

          Petitioner,

                                  Case No. 12-14884

     v.                        HON. TERRENCE G. BERG

STEVE RIVARD,

          Respondent.

_____/

## OPINION AND ORDER DISMISSING
## THE PETITION FOR WRIT OF HABEAS CORPUS;
## DENYING A CERTIFICATE OF APPEALABILITY; AND
## DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Lakari Kareem Berry ("Petitioner"), confined at the Muskegon Correctional Facility in Muskegon, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* application, Petitioner challenges his conviction for first-degree murder, MCL § 750.316(1)(a), second-degree murder, MCL § 750.317, assault with intent to murder, MCL § 750.83, felon in possession of a firearm, MCL § 750.224f, possession of a firearm during the commission of a felony, MCL § 750.227b, and being a third felony habitual offender, MCL § 769.11.

For the reasons stated below, the application for a writ of habeas corpus is DISMISSED WITH PREJUDICE.

## I.      FACTUAL BACKGROUND

Petitioner's conviction arises out of the shooting deaths of Clarence Cherry and Gaudrielle Webster and an assault upon Karsia Rice in Detroit, Michigan.

What follows is a summary of the prosecution's evidence, as presented through the testimony of various witnesses.

At trial, Karsia Rice testified that on June 21, 2007, she was visiting her friend Gaudrielle "Angel" Webster at an apartment in Detroit, Michigan, when two men who were armed with guns broke into the apartment yelling, "where's the shit?" (Oct. 22, 2007 Tr., pp. 16-23, 27-29, 77-78). Rice immediately recognized one of the two gunmen as Petitioner, claiming that she had seen him at a party a few months earlier. Although Rice had not been introduced to Petitioner, she noticed Petitioner at the party because he was drunk and acting stupid. (*Id.*, pp. 50-51, 70-71).

Webster ran off to a different room, but Petitioner and his accomplice ordered Rice to "tell that bitch to come back." When Webster came back into the room, Petitioner and his accomplice repeatedly asked Webster, "[w]here your nigger at?" Petitioner took Webster into a bedroom while the other gunman remained with Rice. Rice begged the men not to kill her. (*Id.*, pp. 25-33).

Petitioner then returned Webster to the living room, where she sat with Rice on the sofa while Petitioner searched through the apartment. (*Id.,* pp. 33-35). Petitioner returned to the living room and stole ten dollars from Rice's purse. (*Id.,* p. 78). Rice then overheard Petitioner speaking on his cell phone and telling someone that it was "the wrong day." Petitioner then looked for a long time at Rice and asked her, "don't I know you?" Rice denied that Petitioner did and gave him a

false name.  Petitioner then informed Rice that he was not leaving without hurting her. (*Id.,* pp. 36-37).

Petitioner moved Rice into the bedroom and duct-taped her arms together before also covering her eyes and mouth with the tape.  Webster had her arms similarly taped. (*Id.*, pp. 38-40).

Petitioner and his accomplice then forced Webster to call her boyfriend, Clarence Cherry, and tell him to come over to the house.  Cherry arrived at the apartment approximately ten to fifteen minutes later.  Rice managed to get the tape over her mouth loose and began talking to Webster.  While the women were talking, they heard about 10 gunshots coming from the parking lot. (*Id.*, pp. 41-45).  The gunshots that Rice heard were, in fact, the sounds of Cherry being shot.  The autopsy later revealed that Cherry suffered 20 gunshot wounds in his body, distributed over his legs, arms, abdomen, chest, back, and head.  (Oct. 23, 2007 Tr., pp. 102-07).

Rice then heard a gunshot being fired next to her head.  This gunshot turned out to be the one that fatally wounded Webster.  (Oct. 22, 2007 Tr., p. 45; Oct. 23, 2007 Tr., p. 97).  Rice was then shot in the back of the head by either Petitioner or his accomplice, with the bullet exiting through her eye.  (Oct. 22, 2007 Tr., pp. 45-46).

After Petitioner left, Rice took the tape off of her eyes and discovered Webster's body.  Rice was bleeding heavily, but managed to go outside and seek help. (*Id.*, pp. 47-50).

When the police arrived, Rice told them what happened. That same day, while she was being treated at the hospital, Rice gave descriptions of both gunmen to Officer Stacy Cavin. Rice described Petitioner as being short, dark-skinned, with braids, (*Id.*, pp. 47-54), and informed Cavin that she had seen Petitioner around school with someone she knew as "Hollywood." Rice also told Cavin that the other gunman wore a suit, was taller and had his hair in a ponytail. (Oct. 24, 2007 Tr., pp. 20-23).

On the following day, Rice was shown an array of photographs by the police and had no difficulty identifying Petitioner as the gunman who tied her up and told her that he was not leaving without hurting her. Rice testified that she would never forget his face, and had no doubt that Petitioner was that gunman. When questioned regarding the array of photographs, Rice said that she thought Petitioner's skin tone was darker than her own, and that the skin tone of the other men was brown, but not as dark as that of Petitioner. (Oct. 22, 2007 Tr., pp. 48-54, Oct. 23, 2007 Tr., pp. 13-15).

Sergeant Gary Diaz testified that he showed Rice the photographic array on June 23, 2007, and asked whether she recognized anyone. Diaz testified that without hesitation, Rice immediately pointed to the photograph of Petitioner. (Oct. 25, 2007 Tr., pp. 44-45, 50-51).

Officer Laura Zielinski was one of the first officers to arrive at the scene. At trial, Zielinski testified that upon arrival, she went to the parking area between the buildings and discovered Cherry's body on the ground next to a car. Cherry had

suffered numerous gunshot wounds and there were 11 to 15 bullet casings strewn around his body and car. (Oct. 23, 2007 Tr., pp. 71-75). Zielinski and her partner were subsequently directed inside the apartment where they discovered Webster's body. (*Id.,* pp. 77-78).

Officer Kevin Reed, an expert in firearms, testified that he examined the shell casings recovered from the crime scene and determined that they were .9 millimeter cartridges that had been fired from two weapons. (Oct. 25, 2007 Tr., pp. 5-20).

The preliminary examination testimony of Marquietta Murray, the mother of Petitioner's child, was introduced by the Prosecutor when Murray failed to appear at trial.[1] According to Murray's preliminary exam testimony, Petitioner telephoned her on the day of the shooting and also sent her a text message in the morning, asking her to pick him up at a friend's house. Petitioner purportedly told her that if she did not come and get him, it would be her fault if he went to jail. Murray went and brought Petitioner back to her residence in Mount Clemens. When they arrived at Murray's house, Petitioner told her that whatever he did, she should not have to worry about it. (Oct. 24, 2007 Tr., pp. 66-71, 87-89).

Murray's preliminary exam testimony differed from her prior, investigative subpoena hearing testimony in several respects: During the preliminary exam,

---

[1] Murray had testified as a hostile witness and had been held in custody between the second and third day of the preliminary examination because she was a flight risk. Although Murray was subpoenaed for trial and appeared at court for the first day of jury selection, she did not appear when she was scheduled to testify. The trial judge ruled that Murray had willfully absented herself, that the prosecutor had exercised due diligence in attempting to secure her presence for trial, and that Murray's preliminary examination testimony could therefore be read into evidence during the trial. (Oct. 24, 2007 Tr., pp. 4-17).

despite admitting that she had previously testified under oath at the investigative subpoena hearing and had affirmed that her earlier statements to the police were true, Murray stated that some of her prior statements were inaccurate. (*Id.,* pp. 71-72). Murray had previously testified at the investigative subpoena hearing that Petitioner had informed her that he had shot someone, but at the preliminary exam she said that she just assumed that this is what he had done. At the preliminary exam, Murray admitted that Petitioner had asked her whether she had heard of a shooting on the East Side of Detroit at an apartment building, but denied that she had first learned of the shooting from Petitioner, claiming that she had heard about the shooting on the news first. Murray testified at the investigative subpoena hearing that Petitioner had informed her that he had shot and robbed people at the location that was on the news, but Murray later claimed at the preliminary examination that Petitioner had not said those words. (*Id.,* pp. 71-80). Murray admitted at the preliminary examination that she knew that Petitioner obtained his money by "hitting licks," i.e. robbing people, as well as by selling illegal drugs, and that Petitioner referred to these activities as "going to work." (*Id.,* pp. 75-77). Murray also acknowledged, but disavowed, her prior testimony that earlier on the day of the shootings, Petitioner had told her that he was going to go to work (*Id.,* pp. 80-81); Murray, however, did admit that Petitioner had indicated prior to the shootings that he was going out to rob someone. (*Id.,* pp. 96-98).

Murray also admitted at the preliminary examination that she had testified at the investigative subpoena hearing that when she asked Petitioner what had

happened, he told her that "the lick he was hitting didn't go exactly how it was planned. It went bad." Murray went on to say, "[Petitioner] told me that the shooting had come along in the process and had shot the girl, the one that went through, I guess, the back of her head and she lived or whatever but I guess she's the one that spotted him or whatever." However, Murray insisted at the preliminary examination that her investigative subpoena hearing testimony was not true and that the she learned about the details of the crime from a friend. (*Id.,* pp. 92-94).

Regardless, during the preliminary exam Murray did acknowledge that Petitioner told her that he had committed a robbery that went bad, that a woman had been shot in the head, and that when Murray asked Petitioner whether he had shot the woman, he said it was something she did not have to worry about. Petitioner indicated that he was sorry that he was in trouble and told Murray to take care of their son. (*Id.,* pp. 98-101). Murray also stated she knew that Petitioner carried a .9mm handgun. (*Id.,* p. 72).

Murray further testified at the preliminary exam that when Petitioner was at her house on the morning of the shooting, he received a number of calls informing him that he should obtain new cell phones because the ones he had been using might be monitored, and that Petitioner and Murray then went out and purchased new cell phones, using someone else's name. (*Id.,* pp. 101-08). However, Murray then claimed that she had provided the information and testimony to the police concerning the shooting because the police threatened to take her children. (*Id.,* pp.

80-86, 132-33, 136-38).  Nonetheless, Murray did acknowledge that she had talked with both Petitioner and his sister before coming to testify at the second day of the preliminary examination (when she changed her story to assert that Petitioner had not said that he shot someone).  (*Id.,* pp. 121-25).

Detective Kelly Knox Mullins testified that Murray had not been threatened in her presence.  When Murray changed her testimony on the second day of the preliminary examination and claimed she had been threatened, Mullins investigated the claim.  The Family Independence Agency did have a pending neglect case involving Murray's children, but it was months old at the time of the shooting.  (Oct. 25, 2007 Tr., p. 76).

The parties stipulated that Petitioner had been previously convicted of a specified felony and had not met the requirements for regaining eligibility to lawfully possess a firearm.  (*Id.,* p. 30).

Regarding Webster, Petitioner was convicted of two counts of first-degree murder, based on alternative theories of premeditated murder and felony murder.  Regarding Cherry, although Petitioner had been charged with two counts of first-degree murder on the same alternative theories, Petitioner was convicted of two counts of second-degree murder, as lesser included offenses on those counts.  Petitioner was also convicted of assault with intent to commit murder with respect to Rice, as well as the firearm counts.

Petitioner appealed his conviction to the Michigan Court of Appeals.  The Michigan Court of Appeals vacated one of his second-degree murder convictions

8

(regarding the killing of Cherry), and remanded the case to the trial court to correct the judgment of sentence to reflect one conviction and sentence for first-degree murder supported by alternative theories (regarding the killing of Webster). The Michigan Court of Appeals also ordered that the judgment of sentence be amended so that the sentence on the felon in possession of a firearm conviction be served concurrent to the sentence for the murder and assault convictions, instead of consecutively. The Michigan Court of Appeals affirmed Petitioner's conviction in all other respects. *People v. Berry,* No. 282605 (Mich. Ct. App. Apr. 30, 2009). The Michigan Supreme Court subsequently denied Petitioner leave to appeal. *People v. Berry,* 485 Mich. 898; 772 N.W.2d 417 (2009) (Table).

Petitioner then filed a post-conviction motion for relief from judgment pursuant to M.C.R. 6.500, *et. seq.,* which was denied. *People v. Berry,* No. 07-11878-01 (Wayne County Circuit Court Jan. 4, 2011). The Michigan appellate courts denied Petitioner leave to appeal the denial of the post-conviction motion. *People v. Berry,* No. 305632 (Mich. Ct. App. Dec. 27, 2011); *lv. den.* 492 Mich. 865; 819 N.W.2d 907 (2012) (Table).

On May 7, 2013, the Wayne County Circuit Court amended the judgment of sentence in conformance with the Michigan Court of Appeals' decision to reflect that Petitioner was convicted of only one count of first-degree murder with respect to Webster and one count of second-degree murder with respect to Cherry.

Petitioner now seeks a writ of habeas corpus on the following grounds:

I. Petitioner's conviction of two counts of first-degree murder and two counts of second-degree murder for two murders violates double jeopardy.

II. Petitioner was denied the effective assistance of trial counsel.

III. The prosecutor was allowed to admit evidence that had nothing to do with Petitioner's case.

IV. Petitioner was denied the effective assistance of appellate counsel.

V. The prosecutor improperly and knowingly used perjured testimony.

VI. The trial court improperly denied Petitioner's motion for relief from judgment without making specific findings of fact or law.

VII. Petitioner was denied the effective assistance of appellate counsel for failure to raise meritorious issues on appeal.

## II.    LEGAL STANDARD

Federal courts reviewing petitions for habeas corpus are required to give great deference to the state courts.  28 U.S.C. § 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v.*

*Taylor*, 529 U.S. 362, 405-06 (2000).   An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.   A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The "[Antiterrorism and Effective Death Penalty Act] thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).   "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. ---, ---, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)).  Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible

11

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.*

"[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington,* 131 S. Ct. at 786. Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (citing *Jackson v. Virginia,* 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)). Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford,* 537 U.S. at 24. Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 131 S. Ct. at 786-87. Finally, in reviewing Petitioner's claims, this Court must remember that under the federal constitution, Petitioner was "entitled to a fair trial but not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 619 (1953).

### III.   ANALYSIS

**A.   Claim I – The Double Jeopardy Claim.**

Petitioner first claims that his right to protection against being placed in Double Jeopardy was violated when he was convicted of two counts of first-degree murder with respect to Ms. Webster and two counts of second-degree murder with respect to Mr. Cherry.

The Michigan Court of Appeals agreed that Petitioner could not be convicted of separate counts of first-degree premeditated murder and first-degree felony murder for Ms. Webster or two counts of second-degree murder with respect to Mr. Cherry.  The Michigan Court of Appeals vacated one of the second-degree murder convictions and remanded the matter to the trial court to correct the judgment to reflect a total of one first-degree murder conviction with respect to Ms. Webster, supported by alternate theories of premeditation and felony murder.  *Berry,* No. 282605, Slip. Op. at *1-2.

Petitioner's Double Jeopardy claim—that he was improperly convicted of two counts of first-degree murder with respect to Ms. Webster and two counts of second-degree murder with respect to Mr. Cherry—has been mooted by the Michigan Court of Appeals Order.  *See Harris v. Metrish,* No. 04-CV-73323-DT; 2006 WL 1313804, *6 (E.D. Mich. May 12, 2006) (citing *Nichols v. Moore,* 923 F. Supp. 420, 423-24 (W.D.N.Y. 1996)); *see also Tiggart v. Robinson*, 36 F. App'x 750, 751 (6th Cir. 2002).

Petitioner is not entitled to relief on his first claim.

**B.      Claims II, IV, and VII – The Ineffective Assistance of Counsel Claims.**

In the interest of clarity, the Court will discuss Petitioner's second, fourth, and seventh claims together.  In these claims, Petitioner contends that he was deprived of the effective assistance of both trial and appellate counsel.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test.  First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance.  *Id*.  In other words, Petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy.  *Strickland,* 466 U.S. at 689.  Second, the defendant must show that such performance prejudiced his defense.  *Id*.  To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland,* 466 U.S. at 694.  "*Strickland*'s test for prejudice is a demanding one.  'The likelihood of a different result must be substantial, not just conceivable.'"  *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011) (quoting *Harrington*, 131 S. Ct. at 792).  The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly

14

deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009). The *Strickland* standard applies as well to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005).

More importantly, on habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 131 S. Ct. at 785. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough*, 541 U.S. at 664). Pursuant to § 2254(d)(1), a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas Petitioner. *Id.* This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 131 S. Ct. at 785. Because of this doubly deferential standard:

> "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."

*Id.* at 788.  It is for this reason that "[s]urmounting *Strickland's* high bar is never an easy task."  *Id.* (quoting *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)).

Finally, this Court is aware that "[R]eliance on 'the harsh light of hindsight' to cast doubt on a trial that took place" six years ago and a direct appeal that concluded over four years ago "is precisely what *Strickland* and AEDPA seek to prevent." *Id.* at 789.

### 1.    Trial Counsel – Failure to Investigate

Petitioner first contends that his trial counsel was ineffective because he failed to request discovery or a court-appointed investigator until the final pre-trial conference.  An investigator was appointed three weeks prior to trial.  Within three days of trial, trial counsel had yet to discuss the case with the investigator.  On the first day of trial, counsel requested an adjournment on the ground that he had not yet completed the investigation, had only recently received the preliminary examination transcripts, that a recent illness had hampered him in his ability to prepare for trial, and that needed more time to file a notice of alibi.  The trial judge refused to adjourn the trial, but delayed the presentation of testimony for one week.  Following this additional time, trial counsel informed the trial court that he was ready to proceed with trial.  Petitioner, however, claims that because counsel did not earlier seek discovery or an investigator, he was unprepared for trial.

The Michigan Court of Appeals rejected this claim, on the ground that Petitioner had failed to show that the investigator would have uncovered evidence

that would have changed the outcome of the trial had he been appointed earlier. *Berry,* No. 282605, Slip. Op. at *4.

A habeas Petitioner cannot show deficient performance or prejudice resulting from counsel's failure to investigate if the Petitioner does not make some showing that there was evidence counsel should have pursued and that such evidence would have been material to his or her defense. *See Hutchison v. Bell*, 303 F.3d 720, 748 (6th Cir. 2002). Petitioner cannot prevail on his claim that trial counsel was ineffective for failing to adequately prepare the case or conduct a minimal investigation because he has failed to show how such additional pretrial work would have been beneficial to his defense. *See Martin v. Mitchell,* 280 F.3d 594, 607-08 (6th Cir. 2002).

### 2.    Trial-Counsel – Failure to File Witness List

Petitioner next claims that trial counsel was ineffective for failing to file a defense witness list in advance of trial. The Michigan Court of Appeals rejected this claim, because counsel was able to present four witnesses on Petitioner's behalf and there was no showing that any witnesses had been excluded because of the late filing of the witness list. *Berry,* No. 282605, Slip. Op. at *4. Because Petitioner has failed to show that he was prejudiced by counsel's late filing of the defense witness list, he is not entitled to habeas relief on his claim. *See Johnson v. Wolfe,* 44 F. App'x 702, 719 (6th Cir. 2002).

### 3.    Trial-Counsel – Cross-Examination and Impeachment

Petitioner next contends that trial counsel was ineffective in his approach to cross-examination and impeachment. Petitioner first contends that his trial counsel

was ineffective for pausing between questions, which caused the trial judge to admonish defense counsel before the jury. Petitioner also contends that trial counsel was ineffective for asking Sergeant Matt Fulks questions that the judge found to be irrelevant and for pursuing questions regarding the collection of evidence that the trial judge deemed to be a "theoretical discussion." Petitioner also claims that trial counsel was ineffective for attempting to introduce inadmissible evidence of a victim's background check, which the trial judge excluded on hearsay grounds. The Michigan Court of Appeals rejected these claims on the ground that counsel's method and line of questioning were all valid trial tactics. *Berry,* No. 282605, Slip. Op. at *4-5.

"Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.*

In the present case, counsel's pauses between questions could have been a valid trial tactic to allow the jury time to consider the elicited evidence and to afford counsel time to organize his trial strategy. Because counsel's style of questioning could have been a valid trial tactic, Petitioner is unable to establish that counsel's pace of questioning amounted to the ineffective assistance of counsel. *See White v. Singletary,* 972 F.2d 1218, 1223 (11th Cir. 1992) (defense counsel's rambling style of cross-examining did not amount to ineffective assistance, as said style was adopted

18

to confuse witnesses, and there was no indication of what additional testimony should have been elicited and how it would have changed outcome of trial). Moreover, the Michigan Court of Appeals stated that any prejudice to Petitioner that resulted from the trial judge admonishing defense counsel over the pace of his questioning was ameliorated by the judge's instructions to the jury that they should ignore any opinions he might have about the case. *Berry,* No. 282605, Slip. Op. at *4.

With respect to defense counsel's lines of questioning concerning the preservation of evidence and evidence collection, defense counsel may have believed that these questions were relevant, even though the judge decided otherwise. Likewise, the Michigan Court of Appeals viewed counsel's attempt to introduce evidence of the victim's background as a good faith attempt to "cast a shadow on the victim" or to frame Petitioner "in a more positive light." *Id.* at *5. In light of the deferential standard afforded to a trial counsel's decisions, this Court cannot conclude that counsel was deficient for pursuing a line of questioning that was deemed inappropriate by the judge. *See U.S. v. Robson,* 307 F. App'x 907, 912 (6th Cir. 2009). Moreover, even if a trial tactic were found to be deficient, there must be some showing that the deficiency caused prejudice. Here, Petitioner does not offer any argument as to how counsel's cross-examination and impeachment tactics impacted the outcome of the trial in any way that caused prejudice.

### 4.   Trial-Counsel – Questions Posed to Sergeant Diaz

As a related claim, Petitioner contends that his trial counsel was ineffective for failing to pursue a line of questioning with Sergeant Gary Diaz concerning how

19

Petitioner's picture came to be placed in the photographic lineup that was displayed to Rice.  Although counsel began questioning Sergeant Diaz concerning the quality of the police investigation and the identification of Petitioner, the judge excused the jury before Sergeant Diaz testified that he matched an anonymous tip with the name "Kari" to Petitioner and his photograph.  During a discussion outside the jury's presence, counsel indicated that he was not sure that he wanted the jury to hear that Petitioner's name was in a police database.  The Michigan Court of Appeals concluded that counsel's decision not to pursue this line of questioning was reasonable in light of the potential harm that would be caused by the jury hearing that Petitioner's name was in a police database, as well as the fact that there was "ample evidence" at trial establishing Petitioner's identity as the shooter.  *Berry*, No. 282605, Slip. Op. at *5.

In the present case, trial counsel may have reasonably determined that evidence that Petitioner's name had been in a police database and that he had been identified as a suspect by an anonymous tip would have been more prejudicial than exculpatory.  Therefore, the Michigan Court of Appeals did not unreasonably apply *Strickland* in rejecting Petitioner's claim.  *See Greenwell v. Elo*, 77 F. App'x 790, 793 (6th Cir. 2003).

### 5.    Trial-Counsel – Meritless Hearsay Objection

Petitioner next claims that trial counsel was ineffective for making a meritless hearsay objection to the admission of Murray's statements to the police and her investigative subpoena testimony.  The Michigan Court of Appeals rejected this claim, on the ground that Petitioner could not have been prejudiced by the

20

objection because it was made outside of the presence of the jury and that it was not unreasonable in any event for counsel to attempt to exclude evidence that he believed was harmful to Petitioner. *Berry*, No. 282605, Slip. Op. at *6.

In light of the fact that counsel's objection took place outside of the jury's presence, Petitioner was not prejudiced by the objection, even if improper. *See e.g. Robson,* 307 F. App'x at 912. Because Petitioner has failed to show that counsel's allegedly improper objection had a substantial and material effect on the jury's verdict, Petitioner is unable to establish that counsel was ineffective. *See U.S. v. O'Donnell,* 111 F. App'x 60, 62 (2d Cir. 2004).

### 6.    Trial-Counsel – Failure to Object to Expert Testimony

Petitioner next claims that trial counsel was ineffective for failing to object to Officer Eugene Fitzhugh's expertise regarding the use of scales to weigh and measure narcotics. The Michigan Court of Appeals rejected this claim on the ground that the prosecutor could have most likely elicited evidence that Officer Fitzhugh had the knowledge, skill, experience, and training in narcotics to give such testimony, given the fact that he had been a police officer for eighteen years. *Berry,* No. 282605, Slip. Op. at *6. Because Petitioner has failed to show a reasonable probability that Officer Fitzhugh's expert testimony would have been excluded had an objection been made, Petitioner is not entitled to habeas relief on this claim. *See Pillette v. Berghuis*, 630 F. Supp. 2d 791, 802 (E.D. Mich. 2009); *aff'd in part and rev'd in part on other grounds,* 408 F. App'x 873 (6th Cir. 2010); *cert. den.* 132 S. Ct. 125 (2011).

### 7.    Trial-Counsel – Failure to Challenge Identification

Petitioner claims that trial counsel was ineffective for failing to move for a pre-trial hearing to challenge Rice's identification of Petitioner.  The Michigan Court of Appeals rejected this claim by noting that defense counsel had objected to Rice's identification at trial by noting that Petitioner had a darker complexion than the other men in the photographic lineup.  The trial judge examined the pictures in the lineup and found them to be proper.  The Michigan Court of Appeals also noted that defense counsel properly challenged the weight of the identification by cross-examining Rice at trial about the physical differences between the lineup participants.  Finally, the Michigan Court of Appeals concluded that even if counsel had successfully challenged the pre-trial identification, Rice's in-court identification of Petitioner would have been admitted  because she had an independent basis for her in-court identification due to the fact that she observed Petitioner for over ten minutes, had recognized him from a party, and had expressed a high degree of certainty about her in-court identification, even testifying that she would never forget Petitioner's face.  *Berry,* No. 282605, Slip. Op. at *6-7.

Petitioner is not entitled to habeas relief on this claim for three reasons. First, counsel's failure to bring a pre-trial motion to challenge the suggestiveness of the pre-trial identification procedure did not prejudice Petitioner in light of the fact that he objected to the lineup procedure at trial, the judge rejected his objection, finding the photographic array to be proper, and there has been no showing that an earlier motion to suppress the pre-trial identification procedure would have been granted.  *See Easter v. Fleming,* 132 F. App'x 706, 708 (9th Cir. 2005).  Secondly, the

22

decision to attack the credibility of Rice's identification of Petitioner through cross-examination, as opposed to bringing a pre-trial motion to suppress the identification, was a reasonable trial strategy that defeats Petitioner's ineffective assistance of counsel claim. *See Millender v. Adams,* 187 F. Supp. 2d 852, 868 (E.D. Mich. 2002), and *Monroe v. Smith,* 197 F. Supp. 2d 753, 760 (E.D. Mich. 2001) (both citing *Killebrew v. Endicott*, 992 F. 2d 660, 665 (7th Cir. 1993)). Finally, in light of the fact that Rice's identification of Petitioner was independently reliable, given the ample opportunity that she had to observe Petitioner at the crime scene, her previous familiarity with Petitioner, and the certainty of her in-court identification, Petitioner was not prejudiced by trial counsel's failure to make a pre-trial motion to suppress Rice's in-court and out-of-court identifications on the basis that the lineup was suggestive. *See Howard v. Bouchard,* 405 F.3d 459, 481-485 (6th Cir. 2005). Without prejudice, there is no claim for ineffective assistance.

### 8.    Trial Counsel – Cumulative Error

Petitioner finally contends that he is entitled to habeas relief because of the cumulative effect of counsel's errors. Because the individual claims of ineffectiveness alleged by Petitioner are all essentially meritless or of minimal significance, Petitioner cannot show that the cumulative errors of his counsel amounted to ineffective assistance of counsel. *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Petitioner is therefore not entitled to habeas relief on his second claim; i.e., that his trial counsel provided ineffective assistance.

9.     **Appellate Counsel**

In his fourth and seventh claims, Petitioner alleges that appellate counsel was ineffective for failing "to provide a concise statement of facts in his initial brief and raise meritorious issues on direct appeal." (Dkt. 1, p. 32)

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985). However, court appointed counsel does not have a constitutional duty to raise every non-frivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). This Court has already determined that Petitioner's ineffective assistance of trial counsel claims are without merit and, as discussed below, also determines that Petitioner's third and fifth claims are without merit. "[A]ppellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).

Because none of Petitioner's underlying claims can be shown to be meritorious, appellate counsel was not ineffective in his handling of Petitioner's direct appeal. Thus, Petitioner is not entitled to habeas relief on his fourth and seventh claims.

C.     **Claim III – The Irrelevant Evidence Claim.**

Petitioner next claims that he was denied a fair trial when the prosecutor introduced evidence concerning firearms and ammunition that were recovered from Petitioner's parents' home on the ground that such evidence was irrelevant and had nothing to do with Petitioner's case.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court, and "cannot rise to the level of a due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to ranked as fundamental.'" *Seymour v. Walker,* 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). Petitioner's claim that the admission of irrelevant evidence denied him a fair trial is such an issue of state law, and given the weight of the evidence in this case—even assuming that this evidence should have been excluded as more prejudicial than probative—any prejudice that may have resulted is not of constitutional significance.

As a related claim, Petitioner contends that counsel was ineffective for failing to move for a mistrial after this evidence was admitted at his trial. Even if this evidence were irrelevant, because the more serious convictions are supported by the testimony of a surviving victim, Petitioner is unable to show that he was prejudiced by the admission of this evidence, and thus counsel's failure to move for a mistrial following its admission cannot be considered ineffective assistance. *See Olden v. U.S.,* 224 F.3d 561, 567 (6th Cir. 2000). Consequently, Petitioner is not entitled to habeas relief on his third claim.

25

D.      **Claim V – The Perjury Claim.**

Petitioner next claims that his due process rights were violated because his conviction was based on the perjured testimony of Marquietta Murray.

The deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. *Giglio v. United States*, 405 U.S. 150, 153 (1972). A defendant is also denied due process where the prosecutor allows false evidence or testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

To prevail on a claim that a conviction was obtained by use of false or perjured testimony, a habeas petitioner must show that the statements were "indisputably false," that the statements were material, and that the prosecutor knew they were false. *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000).

Mere inconsistencies in a witness' testimony do not establish the knowing use of false testimony by the prosecutor. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). Further, both the Prosecutor and Petitioner's trial attorney questioned Murray at the preliminary exam about the inconsistencies in her story. *Berry,* No. 282605, Slip. Op. at *6-7. The fact that Murray was subjected to cross examination and impeachment with her prior inconsistent statements ameliorates any prejudice which may have arisen from their introduction. Additionally, the fact that a witness contradicts himself or herself or changes his or her story does not establish perjury. *See Malcum v. Burt,* 276 F. Supp. 2d 664, 684 (E.D. Mich. 2003) (citing *Monroe v. Smith*, 197 F. Supp. 2d at 762).

26

Petitioner has presented no evidence to establish that Murray testified falsely at Petitioner's preliminary examination.  Conclusory allegations of perjury in a habeas corpus petition must be corroborated by some factual evidence.  *Barnett v. United States*, 439 F.2d 801, 802 (6th Cir. 1971).  More importantly, even assuming that Murray may have testified falsely about certain matters, Petitioner is still not entitled to habeas relief on his perjury claim, because he has failed to show that the prosecutor knew that Murray had testified falsely.  *See Rosencrantz v. Lafler,* 568 F.3d 577, 587 (6th Cir. 2009).  Petitioner is not entitled to habeas relief on his fifth claim.

**E.    Claim VI – The Claim Regarding the State Court's Deficient Adjudication of Petitioner's Post-Conviction Motion.**

In his sixth claim, Petitioner contends that the trial court erred when it denied his post-conviction motion for relief from judgment without making any specific findings of fact.

Petitioner's claim that the Michigan courts wrongfully denied him post-conviction relief is non-cognizable.  This Court notes that "[t]he Sixth Circuit consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review."  *Cress v. Palmer,* 484 F.3d 844, 853 (6th Cir. 2007).  Thus, a federal habeas corpus petition cannot be used to mount a challenge to a state's scheme of post-conviction relief.  *See Greer v. Mitchell,* 264 F.3d at 681.  The reason for this is that the states have no constitutional obligation to provide post-conviction remedies.  *Id.* (citing *Pennsylvania v. Finley,* 481 U.S. 551, 557 (1987)).  Challenges to state collateral post-conviction proceedings "cannot be brought under

27

the federal habeas corpus provision, 28 U.S.C. § 2254," because "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and ... the traditional function of the writ is to secure release from illegal custody.'" *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)).  "A due process claim related to collateral post-conviction proceedings, even if resolved in a Petitioner's favor, would not 'result [in] ... release or a reduction in ... time to be served or in any other way affect his detention because [the Court] would not be reviewing any matter directly pertaining to his detention.'" *Cress,* 484 F.3d at 853 (quoting *Kirby*, 794 F.2d at 247).  Thus, the "'scope of the writ'" does not encompass a "'second tier of complaints about deficiencies in state post-conviction proceedings.'" *Cress*, 484 F.3d at 853 (quoting *Kirby*, 794 F.2d at 248).  "[T]he writ is not the proper means to challenge collateral matters as opposed to the underlying state conviction giving rise to the prisoner's incarceration." *Id.* (internal quotations omitted).  Petitioner's allegation that his constitutional rights were violated when the state post-conviction relief court failed to make any findings of fact or conclusions of law does not rise to the level of a cognizable claim and cannot serve as a basis for granting Petitioner habeas relief. *See King v. Bowersox,* 213 F. Supp. 2d 1026, 1035 (E.D. Mo. 2001).  Petitioner is not entitled to habeas relief on his sixth claim.

## IV.   CONCLUSION & ORDER

The Court will dismiss the petition for writ of habeas corpus.  The Court will also deny a certificate of appealability to Petitioner.  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the

applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; *see also Strayhorn v. Booker,* 718 F. Supp. 2d 846, 875 (E.D. Mich. 2010). In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas Petitioner's constitutional claims on the merits, the Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.

For the reasons stated in this opinion, the Court will deny Petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *See also Millender v. Adams,* 187 F. Supp. 2d at 880.

The Court will also deny Petitioner leave to appeal *in forma pauperis*, because any such appeal would be frivolous. *See Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001).

Accordingly, based upon the foregoing, **IT IS ORDERED** that the Petition for a Writ of Habeas Corpus is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **DENIED,**

and Petitioner is **DENIED** leave to appeal *in forma pauperis.*

Dated:  December 30, 2013                    s/Terrence G. Berg
                                            TERRENCE G. BERG
                                            UNITED STATES DISTRICT JUDGE

### Certificate of Service

    I hereby certify that this Order was electronically submitted on December 30, 2013, using the CM/ECF system; a copy of this Order was also mailed to 348177 Muskegon Correctional Facility, 2400 S. Sheridan, Muskegon, Michigan 49442, addressed to Petitioner's attention.

                                            s/A. Chubb
                                            Case Manager